# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| SANTEZ BRADFORD | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 3:20-cv-00526 |
| | ) | (Crim. Nos. 3:15-cr-00088-6 & |
| UNITED STATES OF AMERICA | ) | 3:16-cr-00143-2) |

### MEMORANDUM OPINION

Santez Bradford has filed a Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 (Doc. No. 1), in which he claims his conviction for being a felon in possession of a firearm must be set aside based on Rehaif v. United States, 139 S. Ct. 2191 (2019). Thereafter, appointed counsel filed an Amended Motion, alleging the ineffective assistance of counsel during the plea negotiation process and at sentencing. (Doc. No. 7). The Government has filed a response in opposition to both Motions (Doc. No. 11), and Bradford has replied (Doc. No. 12). For the reasons that follow, Bradford's Motions will be denied.

### I. Factual Background

During Bradford's sentencing hearing on December 13, 2019, the Court observed that, "[i]n a ten-week period of criminal activity, from December of 2014 to February of 2015," Bradford was "on a rampage," which involved the possession of stolen firearms, and "shooting multiple persons. Thank goodness, nobody was killed." (Case No. 3:16-cr-00143, Doc. No. 156 at 264). The rampage led to two criminal cases (Case Nos. 3:15-00088-6 & 3:16-cr-0043-2) and the return of indictments against Bradford and many others. Bradford was charged in nine counts with crimes ranging from being a felon in possession of a firearm to possessing firearms during the furtherance of a drug trafficking crime. On December 20, 2019, Bradford received an effective sentence of 264 months for both cases.

For purposes of his present Motions to Vacate, it is unnecessary for the Court to detail the facts underlying the litany of crimes Bradford pled guilty to on July 5, 2017. Rather, the following summary of facts from the Sixth Circuit on Bradford's direct appeal aptly places his present arguments into context:

> Bradford pled guilty to four counts of possessing a firearm as a felon, two counts of possessing a stolen firearm, one count of stealing a firearm, and one count of possessing with intent to distribute cocaine. Included in the plea agreement was Bradford's admission to shooting at a group of people on Claiborne Street in Nashville. That shooting arose from an argument Bradford had with Kenneth Underwood, with whom Bradford's sister had a child. After the argument, Bradford acquired a pistol and, with two friends, sought out Kenneth. Instead, he found Kenneth's sister, Quineshia Underwood, and a group of others on Claiborne Street. Bradford and one of his friends shot at the group repeatedly, fortunately hitting no one. Police found eight bullet casings at the scene.
>
> In December 2017, Bradford, acting pro se, sought to withdraw his guilty plea. Bradford explained that he now believed the lawyer who advised him to plead guilty failed to explore the possibility of suppressing some of the evidence against him. Bradford also wrote that he was "really pleading to stuff [he] didn't do." Bradford later clarified that, when he said "stuff [he] didn't do," he was referring to some of the relevant conduct he admitted to in his plea agreement, not any of the charges. The district court construed Bradford's letter as a motion to withdraw his plea, appointed Bradford new counsel, and scheduled a hearing on the motion.
>
> Applying Sixth Circuit precedent, the district court found that Bradford did not have a fair and just reason for withdrawing his plea. Fed. R. Crim. P. 11(d)(2)(B). In denying the motion, the district court emphasized that Bradford was aware of the possibility of filing a motion to suppress when he entered the guilty plea; delayed seeking to withdraw the plea; was not claiming innocence; had an adequate plea colloquy; and had prior experience in the criminal justice system which should have informed his decision to plead guilty instead of seeking to suppress the evidence against him.

United States v. Bradford, 822 F. App'x 335, 336-337 (6th Cir. 2020).

The "some of the evidence" that Bradford wanted suppressed, and the "stuff he didn't do" serve as the basis for his ineffective assistance of counsel claims. These claims are brought against

2

two different lawyers: David Buckholts, a well-qualified CJA panel attorney who represented Bradford through his change-of-plea hearing; and Gary C. Tamkin, an Assistant Federal Defender, who was appointed after Bradford moved to withdraw his plea and represented him through sentencing.

The evidence Bradford wanted suppressed were incriminating photographs that contained pictures of firearms and some other potential evidence that were taken from a cellphone owned by Heather Coleman, who was Bradford's girlfriend. At the evidentiary hearing regarding Bradford's request to withdraw his plea, Buckholts testified that he spoke with Bradford "multiple times" about filing a motion to suppress, talked with him about the merits of such a motion, and told him "he [Bradford] wouldn't have standing to suppress the photographs off of her [Coleman's] phone." (Case No. 3:15-cr-00088, Doc. No. 732 at 6).[1] Buckholts also conceded that whether to file a motion to suppress was an "important decision." (Id. at 8).

The "stuff he didn't do" relates to his agreeing to admit he shot *at* Underwood, rather than, as he now claims, shooting into the air just to scare Underwood. This serves as an ineffective assistance of counsel claim against Buckholts who allegedly should not have let him agree to the "at" language in the statement of facts used to support his plea. It also serves as the basis for his ineffective assistance claim against Tamkin because, in Bradford's view, he should have been called to rebut the testimony proffered at the sentencing hearing that, in turn, led to a 4-point increase for attempted murder under the advisory Guidelines pursuant to § 2K2.1(b)(2)(6)(B).

Again, the Sixth Circuit's decision on direct appeal adds context and meat to the bones of

---

[1] Bradford testified at the hearing on the motion to withdraw plea that the phone "was more like [his] phone than it was hers," but conceded Coleman "paid the bills and stuff." (Id. at 59)

3

this argument:

> At the sentencing hearing, the government presented evidence supporting the attempted murder cross-reference, including testimony from witnesses to the shooting on Claiborne Street, testimony from another person who Bradford told about the shooting, and photographs from Claiborne Street after the shooting. Quineshia testified that on the evening of December 22, 2014, she saw Bradford, who she recognized, and heard him identify her as Kenneth's sister to his friend before firing thirteen to fifteen shots at her from fifty feet away. Underwood further testified that, while neither she nor others were hit by the bullets, she "could feel them coming past" and that she "felt like if [she] would have moved, [she] probably would have got hit." Jeremiah Haynes testified that on December 22, 2014, Bradford asked him for a gun and told him that Kenneth "got to shooting at him."
>
> Bradford argued that the attempted murder cross-reference should not apply because he lacked the intent to kill anyone but had instead just fired in the air to scare Underwood. The district court disagreed and found that, after crediting Quineshia's and Haynes's testimony, the preponderance of the evidence supported the enhancement.

Bradford, 822 F. App'x at 337.

## II. Legal Discussion

"The law generally gives federal prisoners just one chance to overturn a final criminal judgment – by alleging any and all errors in a single motion to vacate under 28 U.S.C. § 2255." Hueso v. Barnhart, 948 F.3d 324, 326 (6th Cir. 2020). Nevertheless, "Section 2255 is not a substitute for a direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process." Regalado v. United States, 334 F.3d 520, 528 (6th Cir. 2003). Consequently, "to obtain collateral review relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982). One who has failed to appeal a claim and therefore procedurally defaulted on that claim "must show either that (1) he had good cause for his failure to raise such arguments and he would suffer prejudice if unable to proceed, or (2) he is actually innocent." Id. citing Bousley v. United States, 523 U.S. 614, 622 (1998).

4

Even though Bradford took a direct appeal, he did not raise any of his present claims in that proceeding, nor does he claim that he is actually innocent of the charges against him. Thus, to be successful on collateral review, he must show both cause and prejudice for his procedural default. With this standard in mind, the Court turns to Bradford's claims.[2]

**A. *Rehaif* Claim**

In Rehaif, the Supreme Court examined the interplay between § 922(g)'s prohibition against carrying a firearm by individuals who fall within certain categories from possessing firearms, and § 924(a)(2)'s provision that a person who knowingly violates the statute is subject to up to ten-years imprisonment. The Supreme Court held that the Government was required to prove both that the defendant knew he possessed a firearm, and that defendant knew that he was in a prohibited class (such as being a convicted felon) at the time he possessed the firearm. 139 S. Ct. at 2194. In other words, knowledge of both of these things is an essential element. See United States v. Hobbs, 953 F.3d 853, 857 (6th Cir. 2020) (stating that Rehaif adds a "'knowledge-of-status' element").

Bradford cannot show cause for failing to raise a Rehaif claim on direct appeal. Rehaif was decided on June 21, 2019, and Bradford did not file his notice of appeal until December 23, 2019. (See Case No. 3:15-cr-00088, Doc. No. 361). Even well before then, the issue of whether knowledge of prohibited status was an element of being a felon in possession of a firearm charge "was at the

---

[2] The Government argues that Bradford's Rehaif claim is barred by the "Waiver of Appellate Rights" provision in his plea agreement. The Court disagrees. As recently explained in detail by this Court in Starks v. United States, No. 3:15-CR-00147-5, 2021 WL 351995, at ** 3-5 (M.D. Tenn. Feb. 2, 2021) that waiver provision (and the one typically used in this district) does not bar collateral review of convictions as opposed to sentences. See also In re Brooks, No. 19-6189, 2020 U.S. App. LEXIS 6371 (6th Cir. Feb. 28, 2020); Hall v. United States, Case No. 3:20-cr-00646, Doc. No. 9 at 6-9 (M.D. Tenn, Jan. 21, 2021); Lee v. United States, No. 3:19-cv-00850, 2020 WL 7425862, at *6 (M.D. Tenn. Dec. 18, 2020); United States v. Serrano, No. 3:19-CV-00719, 2020 WL 5653478, at *12 (M.D. Tenn. Sept. 23, 2020).

5

forefront of the relevant legal landscape." United States v. Wooden, 945 F.3d 498, 506 (6th Cir. 2019). In fact, this issue had been "percolating in the courts for years," United States v. Bryant, No. 11-CR-765, 2020 WL 353424, at *3 (E.D.N.Y. Jan. 21, 2020), including within the Sixth Circuit, see, United States v. Wilson, No. 1:17-CR-60, 2019 WL 6606340, at *5 (W.D. Mich. Dec. 5, 2019) (collecting cases dating back to 2010).

Nor has Bradford established prejudice because he has not shown "there is a reasonable probability that, but for [the] errors, he would not have pleaded guilty and would have instead insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). This is because the government's obligation to prove knowledge is not "burdensome," and it may be inferred from circumstantial evidence. Rehaif, 139 S. Ct. at 2198.

Here, the record contains more than sufficient evidence to establish knowledge. At the plea colloquy, Bradford was told that, with respect to Count Two in case No. 3:16-cr-0043, the Government would have to prove that " at the time you possessed the firearms and ammunition you had been convicted of a felony punishable by imprisonment for more than one year," and similarly, with respect to Counts Sixteen, Eighteen, and Twenty in case No. 3:15-cr-00088, the Government "would have to prove that at the time you possessed the firearms you had been convicted previously of a felony . . . punishable by imprisonment of up to one year." Bradford testified under oath that he understood those requirements. (Case No. 3:16-cr-00143, Doc. No. 155 at 11, 14). Further in the statement of facts supporting his change of plea, Bradford admitted the following was "true and accurate":

> Santez Bradford became a convicted felon on October 3rd, 2013, when he was convicted in the Criminal Court of Davidson County, Tennessee in Case 2012-D-3028, of possession with intent to sell or deliver over half a gram of cocaine,

a crime punishable by a term of imprisonment exceeding one year.

(Id. at 27, 38).

Finally, the Presentence Report lists the above felony (PSR ¶ 6). Not only did Bradford not object to this paragraph in his Sentencing Memorandum, he "agreed his adult convictions total 9 points," including "a non-school zone felony drug charge." (Case No. 3:15-cr-00088, Doc. No. 762 at 2, 9). See Clay v. United States, No. 20-1232, 2021 WL 192778, at *1 (8th Cir. Jan. 20, 2021) (Defendant "also cannot show prejudice since he admitted in his plea agreement and again at the change of plea hearing that he had been previously convicted of a crime punishable by more than a year's imprisonment."); Carlyle v. United States, No. 20-11399, 2020 WL 6844052, at *2 (11th Cir. Nov. 23, 2020) (defendant could not show prejudice where he admitted to having three felonies at change of plea hearing and did not object to PSR's statement that he served two years for those crimes). Bradford is entitled to no relief under Rehaif.

**B. Ineffective Assistance Claims**

Because "the Sixth Circuit 'generally do[es] not review ineffective assistance of counsel claims on direct appeal'" United States v. Franco, 484 F.3d 347, 355 (6th Cir. 2007) (citation omitted), and because counsel is unlikely to argue on appeal that he or she was ineffective below, "[i]neffective assistance of counsel can constitute cause for a procedural default," Hodges v. Colson, 727 F.3d 517, 530 (6th Cir. 2013) (citing Murray v. Carrier, 477 U.S. 478, 488 (1986). Put differently, "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." Massaro v. United States, 538 U.S. 500, 504 (2003). Accordingly, the only remaining issues are whether Buckholts and/or Tamkin were ineffective and/or whether that ineffectiveness prejudiced Bradford.

7

"Defendants claiming ineffective assistance must establish two things. First, that the attorney's performance fell below "prevailing professional norms. And second, that the attorney's poor performance prejudiced the defendant's case." Monea v. United States, 914 F.3d 414, 419 (6th Cir. 2019) (citing Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)). "Proving prejudice is not easy" because the petitioner is confronted with the "high burden" of demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (citing Davis v. Lafler, 658 F.3d 525, 536 (6th Cir. 2011)).

**1.** *Ineffective Assistance Claim Against Buckholts Regarding Advice on Motion to Suppress*

Bradford claims that Buckholts was ineffective when Buckholts told him that he lacked standing to file a motion to suppress the contents of Heather Coleman's cellphone. As a preliminary matter on this claim, the Court notes a dispute between the parties as to the harm that must be shown in regard to failing to file a motion to suppress. Bradford argues the Government "mistakenly frames the harm as 'but for Buckholts' advice, Bradford would have filed a suppression motion'; whereas Mr. Bradford has actually claimed (essentially) that 'but for Buckholts' advice, Bradford would not have pleaded guilty.'" (Doc. No. 12 at 1). In reality the pertinent inquiry encompasses a bit of both: "petitioner must show that a suppression motion had merit, and that if the motion had been granted, he would not have pled guilty and would have insisted on his right to stand trial." Brooks v. Edwards, 96 F.3d 1448 (6th Cir. 1996) (citing Hill, 474 U.S. at 60); see also Ray v. United States, 721 F.3d 758, 762 (6th Cir. 2013) (stating in case where claims was that counsel did not file a motion to suppress, defendant must "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice"). Bradford has not made the requisite showing.

8

Recently, the Sixth Circuit made several observations that are particularly pertinent to Bradford's ineffective assistance claims against Buckholts:

> The Sixth Amendment "does not guarantee perfect representation" but only "reasonably competent" representation. Harrington v. Richter, 562 U.S. 86, 110, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (cleaned up). Thus, defense lawyers need not (and in fact should not) raise every colorable argument they can find. See Davila v. Davis, ___ U.S. ___, 137 S. Ct. 2058, 2067, 198 L.Ed.2d 603 (2017) ("Effective appellate counsel should not raise every nonfrivolous argument[.]"); Wilson v. McMacken, 786 F.2d 216, 219 n.3 (6th Cir. 1986) (trial counsel need not make "every colorable objection"). Tough judgment calls about what to challenge and what to let slide are part of lawyering. Such decisions only become deficient – that is, incompetent – when no reasonable counsel would have made the same choice at the time. Strickland, 466 U.S. at 690, 104 S.Ct. 2052. Here, even if [defendant's] claims could be called colorable, there's simply no argument that they were so strong that every reasonable defense attorney would have run with them.

Moody v. United States, 958 F.3d 485, 492 (6th Cir. 2020).

For a number of reasons, Bradford cannot show prejudice regarding Buckholts' advice. For one, it is hardly clear that Buckholts' statement that Bradford lacked standing was even incorrect. "It has long been a rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure." United States v. Padilla, 508 U.S. 77, 81 (1993) (per curiam). On this point, recall that Bradford testified the cellphone phone was more his than hers, but also conceded that the phone was in Coleman's name and she paid the bills on it.

For another, the likelihood that the contents of Coleman's phone would be suppressed is remote because the cellphone was seized pursuant to a state search warrant that authorized the examination of its contents. This occurred after police came to suspect Aweis Haji-Mohamed of first-degree murder and learned from Coleman that Haji-Mohamed (1) came to her house immediately after the murder; (2) was "good friends with her boyfriend Santez Bradford and

9

Jarcarlvis Marable"; (3) "call[ed] her phone on a daily basis to make contact with Bradford and Marable"; and (4) had been in "sustained and regular contact" with her. (Case No. 3:16-cr-00143, Doc. No. 107-1 at 1). Thus, to successfully establish standing, Bradford would have to show he had a reasonable expectation of privacy in the phone, United States v. Noble, 762 F.3d 509, 526 (6th Cir. 2014), notwithstanding that Coleman told detectives the phone was hers and she used it to keep in contact with Haji-Mohammed. And, of course, he would have to get around the reality that a search warrant had been issued by a state judge for the content of Heather Coleman's phone in order to prevail on a motion to suppress.

Assuming Bradford had standing to suppress evidence from Coleman's phone and assuming that he was somehow able to prevail on a motion to suppress, the Court has nothing before it to establish that Bradford would not have pled guilty had he been given different advice by Buckholts regarding standing. However, in his Amended Motion, Bradford – in bold font – "requests an evidentiary hearing in which to testify that . . . but for the wrong advice, he would not have entered a guilty plea[.]" (Doc. No. 7 at 5). That request will be denied.

"An evidentiary hearing 'is required unless the record conclusively shows that the petitioner is entitled to no relief.'" Martin v. United States, 889 F.3d 827, 832 (6th Cir. 2018) (quoting Campbell v. United States, 686 F.3d 353, 357 (6th Cir. 2012)). "Most assuredly, the words 'grant a prompt hearing' [in Section 2255] are not magic words requiring a district judge, who is fully familiar with the circumstances under which a guilty plea was made, to duplicate procedures and conduct a hearing to resolve alleged fact issues which can and should be decided on the record that already exists." United States v. Todaro, 982 F.2d 1025, 1030 (6th Cir.1993).

An evidentiary hearing is not necessary because the same argument was raised by Bradford

and rejected by the Court in the context of Bradford's motion to withdraw his plea. With regard to the issue surrounding the filing of a motion to suppress and standing, the Court ruled:

> Bradford was fully aware of the possibility of filing a motion to suppress. This is not a case where Mr. Bradford ordered his counsel or instructed his counsel to file such a motion and when the counsel failed to do so he proceeded to plead. Instead, this is a case where he knew that there was a possible suppression motion. He talked to his counsel, Mr.Buckholts, about that. He accepted Mr. Buckholts' advice about – and his opinion on that motion to suppress. And that one factor was one of several factors he considered in making his decision to plead guilty.

(Case No. 3:15-cr-00088, Doc. No. 732 at 112). Simply put, the Court "d[id] not find credible," or "logical or believable," id. at 106, that Bradford would not have pled guilty but-for Buckholts' allegedly incorrect advice. There is no reason to think that the Court would find any differently now.

## 2. *Ineffective Assistance Claims Against Buckholts and Tamkin Regarding Shooting At Underwood*

Bradford next claims Buckholts was ineffective because he did not explain to him the implications of the "shot at" language, and claims "he would not have entered the guilty plea if he had known the language could or would have been used to prove" he shot at Underwood. (Doc. No. 8 at 2). Rather, he understood the statement of facts "to mean he shot in the air and not at persons directly with intent to hit a person[.]" (Id.). Again, in bold-faced font, Bradford "requests an evidentiary hearing in which to testify that he did not shoot in the direction of persons but rather in the air; and . . . he would not have entered a guilty plea nor agreed to the statement of facts[.]" And, again, the Court finds an evidentiary hearing unnecessary.

Bradford pled guilty pursuant to a written plea agreement containing a statement of underlying facts. Among other things, the statement indicated that Bradford had a simmering dispute

11

with Kenneth Underwood regarding how Bradford's sister ("SE") was caring for her and Underwood's child. Upon hearing that Bradford intended to rob him, Underwood went to the J.C. Napier housing development, argued with Bradford, and left. Bradford then armed himself with a Hi-Point 9mm pistol and, together with another armed cohort, went looking for Underwood. During the search, Bradford "saw a group of several people, including Underwood's sister [Quineshia], on Claiborne Street in the J.C. Napier housing development, and Bradford and one of his confederates "both shot **at** that group people repeatedly but missed them. Bradford and his associates then left the area with their firearms." (Case No. 3:15-cr-00088, Doc. No. 384 at 6) (emphasis added).

      Not only did Buckholts testify that he and Bradford spent a "significant amount of time at the jail" going over the plea agreement "line-by-line" and that Bradford "never disputed that he himself had shot at this group of people including Quineshia," (id., Doc. No. 732 at 19, 21), the same factual statement was read at the change-of-plea hearing. At the conclusion of that reading and after a couple of clarifications from defense counsel unrelated to the issue now before the Court, Bradford admitted under oath that "the information provided to the Court [was] true and accurate"; he did, "in fact, do the things that were just described to the Court"; "the actions that were just described to the Court, were [his] actions"; and "the behavior that's been described to the Court and the factual recitations as it related to [him]. . . are the things [he] actually did." (Case No. 3:16-cr-00143, Doc. No. 155 at 38). Bradford also stated that he understood the potential maximum sentences for all of the crimes charged, that he had been told about the Sentencing Guidelines, that he understood the Court would ultimately determine the actual Guidelines ranges, and that, while the parties agreed to argue for a Guideline sentence, the Court was not bound by the Guidelines, but

12

could vary (or depart) upward or downward.[3]

"A guilty plea is a grave and solemn act," Brady v. United States, 397 U.S. 742, 748 (1970), and "[s]olemn declarations in open court carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74 (1977); see also, Rule 11 Advisory Committee Notes (stating that guilty pleas under Rule 11 are taken with "great care," and that such a plea is not a "trifle, but a grave and solemn act which is accepted with care and discernment"); United States v. Carr, 170 F.3d 572, 576 (6th Cir. 1999). Further, when a "district court carefully conduct[s] a proper, clear, and thorough plea colloquy, any allegedly misleading advice or information given by counsel cannot constitute extraordinary circumstances which would justify granting habeas relief." Curry v. United States, 39 F. App'x 993, 994 (6th Cir. 2002) (citing Ramos v. Rogers, 170 F.3d 560, 565 (6th Cir. 1999)).

Bradford has a diploma from Hunters Lane High School (PSR ¶ 95), and there is nothing unclear about the words surrounding the Underwood incident in the plea agreement. Simply put, it was not incumbent upon Buckholts to explain to Bradford that "shot at" means that someone "shot at" something or someone. Further, upon learning from his own client that Bradford did not dispute shooting at the crowd, it would have been unethical for Buckholts to essentially tell Bradford to lie in order to reduce his potential exposure under the guidelines.

Bradford's claim against Tamkin for ineffective assistance of counsel at sentencing also fails. The essence of his claim here is that he did not put on any proof or call Bradford to testify that he only "shot into the air," and not at the crowd of people gathered in the J.C. Napier housing development on December 22, 2014. Of course, by this point Bradford had already admitted under

---

[3] As it turned out, Bradford's offense level was 35, and his criminal history category was VI, resulting in a Guidelines range of from 292 to 365 months. (Case No. 3:16-cr-143, Doc. No. 151 at 2). The Court varied downward when it imposed the 264 month sentence.

oath during his plea colloquy that he had shot at the crowd. Additionally, at the sentencing hearing Tamkin was presented with testimony from two victims – Quineshia Underwood and her aunt, Denika Carpenter, along with a witness who was with Bradford immediately before and after the shooting.

Carpenter testified that she was in her second floor apartment on the night in question and heard a volley of shots, followed several seconds later by several shots that appeared to have been fired at a closer range. After the shooting, Carpenter found a window broken, and a bullet lodged at the bottom of her kitchen window that apparently had been deflected by the outside screen. (Case No. 3:16-cr-00143, Doc. No. 156 sat 60-63).

Quineshia's testimony was more damning. She stated that she had just dropped her child off at her aunt's house and was outside smoking with four childhood friends when she saw Bradford and another man approach. Even though she had known Bradford all of her life, she ignored him until she heard him say, "[t]here go that ni\*\*\*er sister right there." (Id. at 74). Quineshia turned and saw two gun barrels firing shots in her direction, and heard 13 to 15 shots fired by Bradford and another man. Quineshia further testified that she could feel the bullets fly past her, and was afraid to move for fear of being hit, until one of her friends grabbed her and pulled her onto a porch. (Id. at 74-76).

Finally, Jeremiah Haynes, then an acquaintance of Bradford's, also testified at the sentencing hearing. Haynes stated that, on the night in question, he was called by Bradford who asked to bring him a gun. Haynes drove to the J.C. Napier complex, and told Bradford he did not have a gun. Bradford then left to find a gun and, a few minutes later, Haynes heard gunshots fired. (Id. at 91-98). When Haynes met up with Bradford later, Bradford told him that he (Bradford) and "Rell" "got to

14

shooting at 'em." (Id. at 99).

It was against this backdrop that Tamkin chose not to call Bradford as a witness or produce evidence suggesting that Bradford was merely shooting in the air. There is nothing before the Court to suggest that this constituted ineffective assistance of counsel. Indeed, "[w]hether to call a witness and how to conduct a witness' testimony are classic questions of trial strategy that merit Strickland deference." Rayborn v. United States, 489 F. App'x 871, 878 (6th Cir. 2012). Bradford has provided nothing to overcome that deference.

Even if the failure to call Bradford as a witness was ineffective, Bradford cannot show prejudice. First, the idea that Bradford merely shot into the air and never intended to hurt anyone was already before the Court because Bradford told the probation department as much during a presentence interview. Tamkin also argued at sentencing that the evidence could be viewed as suggesting that Bradford merely shot into the air because of the bullet found in Carpenter's second floor window frame. The Court was entirely unconvinced by this possibility, finding that "[c]ertainly by more than a preponderance there is a wealth of evidence to question Mr. Bradford's explanation." (Id. at 123). Seeing that Bradford was about to be sentenced, it would make no sense for Tamkin to call him to the stand and have him testify that he was only shooting into the air.

Moreover, Bradford's present assertion that he was merely shooting into the air does not square with either the plea colloquy as discussed previously, or with his allocution. Just before sentencing, Bradford stated:

> . . . I went and got a gun and looked for him [Underwood] and stuff. But I never had any intentions of killing him. I never said I was going to kill him or – and when I seen them people right there, I did not see Quineshia Underwood. And I stood on that from day one. I did not see her. I did not know she was right there. I pled guilty to shooting at a crowd of people, and she happened to been right there, and I pled guilty

15

> to shooting at her because she was right there. There was a crowd of people right there. But I never knew at the time that it was her right there. . . .
>
> \* \* \*
>
> And – but I just wanted you to know, like, me trying to hurt somebody physically, like trying to kill somebody or anything, it never crossed my mind. And I know it could have happened. It easily could have happened, you know. Like she said, if the window wasn't – if she didn't pull the window just in time or if nobody didn't grab her out the way, I know it could have happened.
> But it didn't. And I feel like I shouldn't be sentenced for what could have happened on that situation.

(Id. at 256-60, 261-62).

To argue that Bradford never intended to kill anyone is one thing, but it is quite another to suggest that Bradford only shot into the air. His own allocution belies that, and his intent – or lack thereof – was thoroughly advanced by Tamkin. Tamkin argued that Bradford's only "beef " was with Underwood, not his sister, and there was "no proof this Court has that this was a premeditated act to kill somebody." (Id. at The Court was entirely unconvinced by this argument, stating:

> So the Court is persuaded beyond a preponderance of the evidence that Mr. Bradford did engage in shooting. The Court's persuaded that there were multiple people there, even – but there is no proof that Mr. Underwood's there. Quite the contrary. He fired multiple shots at a group of people, specifically at Ms. Quineshia Underwood. I think he did so deliberately, intentionally, with premeditation because of his feelings towards Mr. Underwood and the state of his mind at that time. The proof before the Court, especially the exhibits and pictures shows and confirms again there were multiple shots with multiple bullets in the near vicinity.
>
> Specifically, turning to Ms. Carpenter's testimony that the Court finds persuasive, his actions there could have caused physical injury, if not death, and luckily that didn't occur. The same is true with Ms. Underwood.

(Id. at 119-120). Calling Bradford as a witness simply would not have changed the outcome because his sentence would have been the same, if not worse. See Harrington v. Richter, 562 U.S. 86, 108 (2011) (stating that where a lawyer has "reason to question the truth of his client's account" the

16

lawyer is not obligated by Strickland to pursue a line of inquiry that "might be harmful to the defense" and "expose" a "story" that is an "invention").

Bradford's claims regarding the ineffectiveness of Buckholts and Tamkin fail.

### III. Conclusion

On the basis of the foregoing, Bradford's Motions to Vacate, Set Aside, or Correct Sentence will be denied.

An appropriate Order will enter.

                                                                    */s/ Waverly D. Crenshaw, Jr.*
                                                           WAVERLY D. CRENSHAW, JR.
                                                           CHIEF UNITED STATES DISTRICT JUDGE